**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COLETTE YARONSKI,** | : | **CIVIL ACTION NO. 3:20-CV-1889** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **THE MEADOWS AT EAST** | : | |
| **MOUNTAIN-BARRE FOR** | : | |
| **NURSING AND REHABILITATION,** | : | |
| **LLC, d/b/a THE GARDENS AT** | : | |
| **EAST MOUNTAIN,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Plaintiff Colette Yaronski brings this suit against her former employer, The

Meadows at East Mountain-Barre for Nursing and Rehabilitation, LLC, doing

business as The Gardens at East Mountain ("The Gardens"), for disability

discrimination, retaliation, and related claims under state and federal law.  The

Gardens moves for summary judgment.  We will grant the motion.

**I.    <u>Factual Background & Procedural History</u>[1]**

**A.    Yaronski's Employment with The Gardens**

The Gardens is a skilled-nursing-care and short-term rehabilitation center

located in Wilkes-Barre, Pennsylvania.  (<u>See</u> Doc. 32 ¶ 5).  It employs registered

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise
statement of the material facts, in numbered paragraphs, as to which the moving
party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party
opposing a motion for summary judgment must file a separate statement of material
facts, responding to the numbered paragraphs set forth in the movant's statement
and identifying genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted, the factual

nurses ("RNs"), licensed practical nurses ("LPNs"), certified nursing assistants ("CNAs"), and other staff to care for its residents.  (See id. ¶¶ 4-5; see also Doc. 32-3, Ex. 1 at 24).  The Gardens perennially suffers from staffing shortages and, consequently, it is constantly in the market to hire new RNs, LPNs, and CNAs.  (See Doc. 32 ¶ 13).  All prospective employees must read and acknowledge The Gardens' employee handbook as a condition of employment.  (See Doc. 32-3, Ex. 1 at 66).  Given the "critical nature" of The Gardens' services, it is "essential" that staff be present and working for the duration of assigned shifts.  (See id. at 22; see also Doc. 32 ¶ 8).  The Gardens deems any employee who leaves "the premises more than 5 minutes early from any shift, without a valid reason and permission from a supervisor," to have abandoned their job.  (See Doc. 32-3, Ex. 1 at 22).  "Job Abandonment is considered voluntary termination of employment on the part of the employee."  (Id.)

Yaronski began working for The Gardens as a full-time LPN on March 19, 2018; she acknowledged having read and understood her employee handbook the same day.  (See Doc. 32 ¶¶ 4, 9; see also Doc. 32-3, Ex. 2).  The Gardens assigned Yaronski to the 3:00 p.m. to 11:00 p.m. shift.  (See Doc. 32 ¶ 11).  Her duties included dispensing medication, rendering treatment, completing documentation, speaking with patients' families, and delegating tasks to CNAs.  (See id. ¶ 10).  Yaronski's immediate supervisors were The Gardens' director and assistant director of

---

background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 32, 37).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

nursing, LeeAnn Emerick and Laura Waxmonsky, respectively, as well as the facility's administrator, Gary Malia. (See id. ¶ 12).

**B.     Yaronski's Cancer Diagnosis and Accommodations**

The Gardens excused Yaronski from work on September 18 and 19, 2018, so she could undergo a biopsy. (See id. ¶ 15) She subsequently was diagnosed with breast cancer. (See id. ¶ 14). Yaronski had surgery in October and planned to be out between 30 and 60 days. (See id. ¶ 16). She was ineligible for leave under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, because she had only been working for The Gardens for seven months. (See Doc. 32 ¶ 17; see also 29 U.S.C. § 2611(2)(A)(i) (requiring 12 months of employment to be eligible for FMLA benefits)). Nonetheless, The Gardens authorized a 41-day leave of absence from October 10 to December 7, 2018, followed by seven additional days of leave from December 20-30, and 46-days from January 3 to March 1, 2019. (See Doc. 32 ¶¶ 18-20). On June 25, 2019, Yaronski requested intermittent FMLA leave as needed for possible side-effects of chemotherapy and radiation treatment. (See id. ¶ 22). The Gardens granted Yaronski's accommodation, and she designated her days off as FMLA days. (See id. ¶¶ 23-24). She encountered no issues taking FMLA leave through early December 2019. (See id. ¶ 25; see also Doc. 32-3, Ex. 11 (absence reports)).

**C.     Yaronski's False Complaint**

On November 3, 2019, Yaronski called Malia during her shift to report Brittany Dejoie, a CNA, for "twist[ing] a pudding cup" in her face. (See id. ¶¶ 26, 28). Yaronski gave a written statement three days later alleging Dejoie "came up to

[her] in a very threatening and aggressive manner with a[n] empty pudding bowl and twisted [it] in front of [Yaronski's] face."  (See id. ¶ 28 (quoting Doc. 32-3, Ex. 4)).  Emerick led an investigation of Yaronski's allegations.  (See id. ¶ 34).  Malia, Emerick, and Yaronski's union representative, Florence Kibbler,[2] reviewed surveillance footage from Yaronski's November 3 shift.  (See id. ¶ 35).  Contrary to Yaronski's version of events, Dejoie did not shove a pudding cup in her face.  (See id. ¶ 36).  The video depicts Dejoie holding a pudding cup up to Yaronski and giving her a thumbs up from the opposite side of the nurses' station, approximately 8 to 10 feet away.  (See id. ¶¶ 29-30; see also Doc. 32-4, Malia Dep. 22:21-23:4).  Yaronski also can be seen on camera reenacting her dramatized account of the incident for coworkers elsewhere in the facility.  (See Doc. 32 ¶¶ 31-33).

### D.   Disciplinary Meeting and Termination

Malia, Emerick, and Kibbler concluded Yaronski falsely reported Dejoie. (See id. ¶¶ 35, 36).  Yaronski incurred a Group IV violation for falsifying documents and material facts—a terminable offense.  (See id. ¶ 37; see also Doc. 32-3, Ex. 1 at 61-62, 63).  The Gardens also charged her with a Group III violation for arguing and engaging in disruptive behavior in the resident-care area.  (See Doc. 32 ¶ 38; see also Doc. 32-3, Ex. 1 at 60-61).  Administrators hoped to head off further incidents by "improv[ing Yaronski's] professionalism" rather than firing her.  (See Doc. 32 ¶ 39).

---

[2] Yaronski claims she did not know Kibbler was her union representative until after her termination.  (See Doc. 32-3, Yaronski Dep. 188:25-189:5).

To that end, they intended to place her on a performance improvement plan ("PIP").  (See id. ¶ 40).

Approximately 10 to 20 minutes into Yaronski's shift on December 10, 2019, she was called into a meeting with Malia, Emerick, Kibbler, and Melissa Scott, The Gardens' director of human resources, to discuss the investigation.  (See id. ¶¶ 40, 41).  Just before Yaronski walked into the room, Waxmonsky (who did not attend the meeting) asked how she was doing; Yaronski said she was "very sick" and "just taking it day by day."  (See Yaronski Dep. 150:1-6).  Malia and Emerick began the meeting by outlining their findings: they determined Yaronski lied about the pudding cup incident and behaved inappropriately within earshot of residents.  (See Doc. 32 ¶ 42).  Kibbler seconded their conclusions.  (See id. ¶ 43).  Malia then told Yaronski The Gardens wanted to place her on a PIP instead of terminating her.  (See id. ¶ 44).

Yaronski asked to see the surveillance footage the investigators examined, but Malia said he could not show it to her; Kibbler was concerned Yaronski might harass staff members who appeared in the video.  (See id. ¶¶ 45, 46; see also Malia Dep. 27:21-28:9).  Yaronski "became unruly, slammed her hands on the desk, yelled and made accusations."  (See Doc. 32 ¶ 47).  She refused to sign the PIP.  (See id. ¶ 48).  Malia asked her to calm down and allow Emerick to review the PIP with her.  (See id. ¶ 49).  Yaronski exclaimed, "I'm not signing anything[,] what do you think I'm stupid."  (See Doc. 32-5, Ex. 5).  She told Malia, "You'll have to fire me."  (See id.)

According to the other attendees, each of whom signed a memorandum memorializing the incident, Yaronski then stood up, said she was leaving, and started walking to the door.  (See id.)  Malia asked her to sit down and discuss the matter, but she kept walking, "smiled[,] and said, 'Oh and I'm not staying[,] I'm sick and using an FMLA day, I'm leaving.'"  (See id.; see also Doc. 32 ¶ 50).  Malia believed Yaronski was only feigning illness to avoid being disciplined; she did not appear sick to him or Kibbler, nor did she say she was sick at any point before receiving the PIP.  (See Doc. 32 ¶¶ 51-52, 55).  Malia explained she could not use FMLA leave to circumvent the disciplinary process.  (See Doc. 32-5, Ex. 5).  He told her she was being insubordinate, and he said he would fire her for insubordination and abandonment if she left.  (See id.; see also Doc. 32 ¶ 56).  Kibbler also tried to encourage Yaronski to calm down so she would not lose her job.  (See id. ¶ 58).  Yaronski replied, "[T]erminate me, I'm leaving."  (See Doc. 32-5, Ex. 5).[3]

Yaronski walked to the nurses' station, handed Waxmonsky her keys, signed the narcotics book, and said, "I'm terminated."  (See id.; see also Doc. 32 ¶ 59).  She then called her doctor's office and subsequently informed Malia and Emerick she was advised to go to urgent care if she was feeling ill.  (See Doc. 32-5, Ex. 5; see also Doc. 32 ¶¶ 59, 60).  Malia told Yaronski she should do whatever she felt she needed to do, but it would not affect her termination.  (See Doc. 32-5, Ex. 5).  Yaronski

---

[3] Unbeknownst to the group, Yaronski ostensibly experienced a bout of diarrhea while standing in the doorway to the meeting room, soiling her clothes. (See Doc. 32 ¶ 57).  She left without telling anyone about it, and she did not utilize the restroom.  (See id. ¶¶ 57, 63).

returned to the nurses' station following her second meeting with the administrators, grabbed her bag, and clocked out around 3:35 p.m. (See Doc. 32 ¶¶ 61-62; see also Yaronski Dep. 170:1-4).[4]  The Gardens cited as grounds for Yaronski's termination her insubordination; "[d]isrespectful, [d]eliberate refusal to comply with" instructions; improper use of FMLA leave as an excuse not to review her PIP; and abandonment of her position. (See Doc. 32-5, Ex. 5; see also Doc. 32 ¶ 64).

### E.    Procedural History

Yaronski timely filed a charge with the Equal Employment Opportunity Commission, alleging disability discrimination.  She received a right-to-sue notice in July 2020 and filed this lawsuit soon thereafter.  The Gardens moves for summary judgment.  The motion is fully briefed and ripe for disposition.

## II.    Legal Standards

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light

---

[4] Malia believes Yaronski remained inside the building until almost 4:30. (See Malia Dep. 30:10-31:17, 34:6-35:8, 36:12-15).

most favorable to the non[]moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

## III.   **Discussion**

Yaronski claims The Gardens unlawfully refused her request for leave and terminated her because of her cancer-related disability. She alleges discrimination (Count I) and failure to accommodate (Count II) under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951 *et seq.*; interference with her FMLA rights (Count IV); and retaliation under all three statutes (Counts III and V).

### A.   **Discrimination and Retaliation Claims (Counts I, III, and V)**

The ADA and the PHRA prohibit an employer from discharging an individual due to her disability.[5] See 42 U.S.C. § 12112(a); 43 PA. STAT. AND CONS. STAT. ANN. § 955(a). Both statutes and the FMLA also forbid retaliating against an

---

[5] We review PHRA claims under the same standards as ADA claims. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)).

employee for engaging in statutorily protected activities,[6] such as requesting or utilizing reasonable work accommodations or FMLA leave.  See 42 U.S.C. § 12203(a); 29 U.S.C. § 2615(a)(2); 43 PA. STAT. AND CONS. STAT. ANN. § 955(d); see also Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003); Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004). Courts analyze discrimination and retaliation claims under the ADA and the FMLA using the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The first step of the McDonnell Douglas test requires the plaintiff to establish her *prima facie* case.  See McDonnell Douglas, 411 U.S. at 802.

A plaintiff makes out a *prima facie* case of discrimination under the ADA by presenting sufficient evidence that (1) she has a disability within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodations, and (3) she suffered an adverse employment action as a result of discrimination.  See McGlone v. Phila. Gas Works, 733 F. App'x 606, 609-10 (3d Cir. 2018) (nonprecedential) (citing Gaul v. Lucent Techs., Inc., 134

---

[6] The FMLA does not expressly mention "retaliation."  See Egan v. Del. River Port Auth., 851 F.3d 263, 270 & n.3 (3d Cir. 2017).  By its plain terms, however, Section 2615 of the FMLA makes it unlawful, *inter alia*, "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" subchapter I of the act.  See 29 U.S.C. § 2615(a)(2).  Courts have construed this provision to prohibit retaliating against employees who exercise their rights under the FMLA.  See Marrero v. Camden Cnty. Bd. of Soc. Servs., 164 F. Supp. 2d 455, 463 (D.N.J. 2001) (citing Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206 n.9 (11th Cir. 2001)); see also 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave.").

F.3d 576, 580 (3d Cir. 1998)).  Retaliation claims require a similar threshold showing.

A plaintiff alleging retaliation under the ADA or the FMLA generally must establish

that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse

employment action, and (3) there was a causal connection between her protected

activity and the adverse employment action.  See Krouse v. Am. Sterilizer Co., 126

F.3d 494, 500 (3d Cir. 1997); Capps v. Mondelez Global, LLC, 847 F.3d 144, 152 n.6

(3d Cir. 2017) (citing Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014)).

    If the plaintiff establishes her *prima facie* case, the burden shifts to the

employer to articulate a "legitimate, nondiscriminatory reason" for its decision.  See

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411

U.S. at 802).  The defendant's burden at the rebuttal stage is "'relatively light'"; it is

a burden of production only.  See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir.

2013) (quoting Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006)).  If the

employer meets its burden, the plaintiff then must show by a preponderance of the

evidence the employer's stated reasons were mere pretext for discrimination.  See

Fuentes, 32 F.3d at 763.  To demonstrate pretext and defeat summary judgment, a

plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the

employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action."  See Shaner v. Synthes, 204 F.3d 494, 501 (3d Cir. 2000)

(quoting Fuentes, 32 F.3d at 764).  The plaintiff may call attention to "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons." <u>See</u> <u>Willis v. UPMC Children's Hosp. of Pittsburgh</u>, 808 F.3d 638, 644 (3d Cir. 2015) (quoting <u>Fuentes</u>, 32 F.3d at 764).

Yaronski cannot overcome The Gardens' proffered nondiscriminatory and nonretaliatory reasons for terminating her even assuming she can establish her *prima facie* case for discrimination and retaliation. The Gardens' primary motivation for firing Yaronski was her insubordination during her performance review meeting and the fact she effectively abandoned her position by walking off the job less than an hour into her shift. (<u>See</u> Doc. 32-5, Ex. 5). Although the straw that broke the camel's back may have been Yaronski's sudden resort to FMLA leave—which Malia and others deemed "an excuse not to review" her PIP, (<u>see</u> <u>id.</u>)—an employer's "honest belief that the employee was misusing FMLA leave . . . is a legitimate, nondiscriminatory justification for [] discharge," <u>see</u> <u>Capps</u>, 847 F.3d at 152; <u>see also</u> <u>id.</u> at 152-55 (collecting "honest belief" cases). The "critical inquiry" when confronted with an honest-belief defense "is not whether the employee actually engaged in the conduct for which [she] was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." <u>See</u> <u>id.</u> at 153 (quoting <u>Pulczinski v. Trinity Structural Towers, Inc.</u>, 691 F.3d 996, 1002 (8th Cir. 2012)). That is so because an employer's "honest, albeit possibly mistaken, belief" that an employee engaged in misconduct is insufficient to prove discriminatory or retaliatory intent. <u>See</u> <u>id.</u> at 154 (citing <u>Medley v. Polk Co.</u>, 260 F.3d 1202, 1207-08 (10th Cir. 2001)). The Gardens easily satisfies that standard here.

Malia, Emerick, Scott, and Kibbler uniformly recalled Yaronski became insubordinate when confronted with their investigative findings. (See Doc. 32-5, Ex. 5). She became confrontational when they said she had lied, and she accused them of thinking she was "delusional" and "stupid." (See id.) Yaronski adamantly refused to engage the disciplinary process or review and sign her PIP paperwork. (See Doc. 32 ¶ 48). She told Malia he would "have to fire" her because she would not sign "anything." (See Doc. 32-5, Ex. 5). She stood up from the table, said she was leaving, and headed for the door. (See id.) When Malia asked her to sit down and rejoin the discussion, Yaronski "smiled" and asserted she was "using an FMLA day" because she was "sick." (See id.) Malia told her he thought she was just saying that to get out of the meeting, which is an impermissible use of FMLA leave. (See id.) Yaronski could have justified her actions by explaining that she was experiencing side effects from recent medical treatments and only wanted to postpone the meeting until she felt better or at least had a chance to use the bathroom. She did not. Instead, she dared Malia to terminate her and walked out. (See id.)

Apart from her general denial of "insubordinate and disrespectful behavior," (see Doc. 37 ¶ 52), Yaronski does not contest these details of her conduct, which collectively support the other attendees' belief she was feigning illness to avoid discipline. The sequence of events also is noteworthy. Yaronski grew belligerent and first threatened to leave after learning the surveillance footage disproved her complaint, but she did not mention being ill until Malia instructed her to sit back down. Moreover, Malia did not believe Yaronski was sick because she did not look

ill or exhibit any signs of distress; Kibbler concurred in his assessment.  (See

Doc. 32 ¶ 55).  Even if their beliefs were mistaken, no reasonable factfinder faced

with this record could conclude they were dishonestly held.

Yaronski cannot prove The Gardens' proffered reasons for terminating her

were pretextual, thus her discrimination and retaliation claims fail.

**B.    Failure to Accommodate and Interference (Counts II and IV)**

ADA failure-to-accommodate and FMLA interference claims come with their

own familiar standards.  A plaintiff establishes a *prima facie* case of unlawfully

failing to provide a disability accommodation under the ADA by showing (1) she is

disabled, and her employer knew of her disability; (2) she requested an

accommodation; (3) her employer did not make a good faith effort to accommodate

her; and (4) she reasonably could have been accommodated.  See Capps, 847 F.3d

at 157.  FMLA interference claims require a plaintiff to prove (1) she was an eligible

employee under the FMLA; (2) her employer was subject to the act's requirements;

(3) she was entitled to FMLA leave; (4) she gave notice to her employer of her

intention to take FMLA leave; and (5) she was denied benefits to which she was

statutorily entitled.  See id. at 155.  Seeking FMLA leave "may qualify, under

certain circumstances, as a request for a reasonable accommodation under the

ADA."  See id. at 156-57.

Courts typically do not use the McDonnell Douglas burden-shifting

framework when evaluating accommodation and interference claims because,

unlike discrimination and retaliation claims, an employer's intent when denying

disability accommodations or FMLA benefits is irrelevant to the employee's right to

relief.  See Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006)
("Because the FMLA is not about discrimination, a McDonnell-Douglas burden-
shifting analysis *is not required*.") (emphasis added); Ferreri v. Mac Motors, Inc., 138
F. Supp. 2d 645, 650 n.1 (E.D. Pa. 2001) (McDonnell Douglas "does not apply" to
ADA accommodation claims).  But the justification for these distinct standards
breaks down when a plaintiff's accommodation and interference claims are
premised upon the same facts and adverse action animating her discrimination and
retaliation claims.  See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294,
312 n.25 (3d Cir. 2012) (doubting plaintiff's "automatic right to claim [FMLA]
interference where . . . the claim is so clearly redundant to the retaliation claim,"
and collecting cases rejecting similar efforts); Garner v. Sch. Dist. of Phila., 63 F.
Supp. 3d 483, 500 (E.D. Pa. 2014) (declining to evaluate ADA retaliation and
accommodation claims under different standards because former was "nothing
more than a repackaged statement of" latter) (citation omitted).  In other words,
substantively "identical" claims "premised on the same allegation" should be
analyzed using the same standard.  See Atchison v. Sears, 666 F. Supp. 2d 477, 489
(E.D. Pa. 2009) (plaintiffs "cannot escape the McDonnell Douglas analysis . . . merely
by affixing an 'interference' label to one of [their] duplicative claims").

　　　Yaronski predicates her failure-to-accommodate and FMLA interference
claims on the same adverse act giving rise to her discrimination and retaliation
claims: her termination.  Given the duplicative nature of her various grounds for
recovery, it is appropriate to evaluate them collectively under McDonnell Douglas.
They fail for the same reasons stated above; Yaronski cannot prove The Gardens'

stated motivations for firing her were not bona fide.  See *supra* pp. 11-13.  She cannot defeat that conclusion by refashioning her termination as "interfering" with her FMLA rights or "failing to accommodate" her disability.  There is no substantive daylight between her facially distinct claims.

That said, we recognize the case law is far more definitive in favor of analyzing conceptually-distinct-but-substantively-indistinguishable FMLA interference claims under McDonnell Douglas than it is with respect to redundant ADA discrimination and accommodation claims.  See, e.g., Lichtenstein, 691 F.3d at 312 n.25; Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 282-83 (6th Cir. 2012); Stallings v. Hussmann Corp., 447 F.3d 1041, 1050-51 (8th Cir. 2006); Atchison, 666 F. Supp. 2d at 489.  Assuming, *arguendo*, we must assess Yaronski's failure-to-accommodate claim separately from her disparate treatment claim, notwithstanding that both invariably derive from the same adverse employment decision, we would still find summary judgment for The Gardens appropriate. Yaronski sought accommodation for her disability in the form of intermittent FMLA leave.  (See Doc. 32 ¶ 22; see also Doc 32-3, Ex. 9).  The Gardens approved her request without incident.  (See Doc. 32 ¶ 23).  Not only did The Gardens grant her sick leave every time she asked—excluding the day of her termination, of course— (see, e.g., Doc. 32-3, Ex. 11), it also permitted extended leaves of absence dating back to her initial diagnosis in the fall of 2018, months before she even qualified for FMLA benefits, (see Doc. 32 ¶¶ 14-20); see also 29 U.S.C. § 2611(2)(A)(i).

Yaronski's case turns upon a single discrete instance in which she spontaneously sought FMLA leave in response to being disciplined for behaving

inappropriately in front of residents and falsifying a complaint against another employee.  (See Doc. 32 ¶ 52).  But the FMLA does not exempt employees from generally applicable work and leave-request policies.  See Soutner v. Penn State Health, 841 F. App'x 409, 413-14 (3d Cir. 2021) (nonprecedential) (citing Callison v. City of Philadelphia, 430 F.3d 117, 120-21 (3d Cir. 2005)).  As The Gardens' employee handbook makes clear, Yaronski needed "a valid reason and permission from a supervisor" to leave her shift early, or else she would automatically be terminated for abandoning her post.  (See Doc. 32-3, Ex. 1 at 22 ("Job Abandonment is considered voluntary termination of employment on the part of the employee.")).  Yaronski obviously did not receive permission to leave before declaring her intention to walk off the job in the middle of her shift and challenging Malia to fire her for refusing to review and sign her PIP.  (See Doc. 32 ¶ 56).  In fact, she told Malia she was leaving and he would "have to fire" her before she said anything about being ill.  (See Doc. 32-3, Ex. 5).

It was only after Malia "instructed" Yaronski "to sit down and discuss the matter" that she refused and claimed to be sick.  (See id.)  Even then, she never notified anyone about her general symptoms or need to use the bathroom due to nausea or incontinence, and she did not exhibit signs of illness, (see Doc. 32 ¶¶ 51-52, 55), so there was no basis upon which to evaluate the validity of her reason for leaving work in that moment.  Viewing the record in the light most favorable to Yaronski, no reasonable jury could find The Gardens failed to accommodate her disability in bad faith.  Accordingly, none of her claims can survive summary judgment.

IV.    **<u>Conclusion</u>**

We will grant The Gardens' motion.  An appropriate order shall issue.


/S/ C<small>HRISTOPHER</small> C. C<small>ONNER</small>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania


Dated:      March 31, 2023